P. Lavi

10 Auserehl Court Huntington, New York 11743, USA

Tel: (516)480-2000 , Fax: (516)349-7906 E-Mail: plavi3621@gmail.com

SDN Y FILG SE CTI

2023 AUG 21  AM 11: 42

July 5rd 2023

The Honrable J..Paul Oetken

United state district court ,Southern District

40 Foley square , ny new York 10007

22 – CV–3167

Your Honor

I have received two letters and many documents from Mr christhoper Egelson attorny of MUFG bank

And all associated banks and financial institution acting in united States such as Mitsubishi financial institution ,union bank having 398 branches in usa ,morgan stanley mitshibishi having 21 percent of shares and interest ,having Danamon bank 94.1 percent of shores and interest all decisions makers of danamon bank  are japenese ,Mitsubishi mufg has over $3.3 trillion as asset while our J P morgan chase has only $2.5 trillion assets.,your Honor should request criminal investigation on united state postal services in Chicago Illinoit to fine Mitsubishi mufg at least one billion dollar same as BNP which paid to united state department of treasury one billion dollar as well,with your Honor permission I am attaching letter dated 16 april 2021 addressed to my attorney mr Robin Mashal were as Mr Egleson knew well that I am right in my demanded decided to settle with me amicably but my attorney did not allowed such perfect decision,I am attaching as well affidavit under penalty of purgery signed by miss Aicha Benabdallah who accompied me during my visit with attorney representing Danamon bank which is self explanatorty in two pages ,I am attaching as well fake document dated 28 april 2004 from Danamon bank to undersigned claiming that they had sent tio my sons account with Washington mutual in los angles the amount of $458000which I had asked the leger of this document showing that Danamon had so much credit with Chase to sent such money Danamon became silent , with your Honer permission I had received two emails from Mitsubishi Mufg bank iin new your one from mr Shabahara another from mrs Judith James executive attorneys of mr Steve Cummings who had paid about $600 million as fine to ny  department of finalcial services for money laundering and other crimes ,I am attaching as well information provided to SEC by Mitsubishi mufg years ago confirming that they are fully responsible for

Criminal acts of their employees as well as all subsidiaries such as Danamon Bank ,with your Honor permission I am attaching my request from Honrable judge Brordrick in respect of my claim against Bank Negara Indonesia and their office in ny asking $15 million as damages for committing fraud against JP

Morgan chase actually 87 years old ,based on attached three documents ii had not been able to pay for three years real estate taxes which I live , not been able to have gas in my home for about 90 days ,my social security per month is only $1033 and I do receive rent per month of $1900 I am now married

I respectfully request your Honor to issue your instruction for summery judgement of $4 million plus accumulated interest for two years ,while punishing mitsubisho mufg and all related companies to

P. Lavi

10 Auserehl Court Huntington, New York 11743, USA

Tel: (516)480-2000   Fax: (516)349-7906   E-Mail: plavi3621@gmail.com

Pay at least one billion dollars to united state treasury department .


A copy of this letter with all attachments is going to be sent to mr Christopher Egleson

Attorney of Mitsubishi mufg ..


Pierre Lavi

# Turbo Dynamics Corporation

10 Auserehl Court, Huntington, NY  11743
Tel: (516)480-2000 Fax: (516)349-7906 E-Mail: turbodyncorp@gmail.com `
**F.A.A. Certified Repair Station No. QOMR742L**



*ISO 9001:2008*

*REGISTERED & IN COMPLIANCE*

December 19, 2022

Judge Vernon S. Broderick
United States District Court
500 Pearl Street
New York, NY 10007

**Case No, 22-cv-6000 (VSB)**

Dear Honorable Judge Broderick,

I am in receipt of your letter dated October 14, 2022.
In your correspondence (see attached), there seems to be some confusion, I am the Plaintiff in this case and at no time did I identify myself as counsel for Bank Negara Indonesia ("BNI") or their New York Agency located at 55 Broadway, New York.

I respectfully request your honor to note that Mrs. Orlee Goldfeld has been appointed as Attorney for BNI both in Indonesia and their office in New York City, asking your Honor to dismiss this case.  In her attached please refer to the Table of Authorities - Hanil Bank (5th from the bottom of the page), *Hanil Bank v. PT Bank Negara Indonesia, Case#1548F3D127 (2nd Circuit 1988)*.  In this case, BNI tried to state that they were a "foreign bank" and the law did not apply.  After taking a closer look, your Honor you will see that the court ruled in favor of Hanil Bank.  My case is the same, and I'm sure the Court would agree that BNI, regardless of what their counsel claims, must pay undersigned the total due plus interest while BNI has committed fraud against JP Morgan Chase Bank which is not subject to any statute of limitation by the court.  Also, BNI has used the United States Postal Services to defraud undersigned as well as my company by committing mail and wire fraud.  For this case, your Honor is respectfully requested, after finding BNI guilty, to transfer this case to the United States Postal Services in Chicago, IL for wire and mail fraud committed by BNI making sure that BNI, having $664 billion dollars in assets, pays at least $1 billion dollars to our treasury department.

Initially, I had requested to settle my account by payment of $5 million dollars as settlement amicably, but because of criminal activity of BNI at this time, I am requesting your Honor to issue an Order that BNI Agency in New York City shall pay undersigned and my company Turbo Dynamics Corporation $15 million dollars which is based on $5 million dollars including to but not limited to punitive and exemplary damages.

I look forward to your kind response.

Respectfully submitted,

Pierre Lavi
On behalf of himself & Turbo Dynamics Corporation

PON XIII
Jakarta 1993

BANK RESMI PON XIII

2.

Jakarta, May 2nd. 1996

To : Mr. Pierre Lavi
Hilton Hotel Room 1305
Jakarta – Indonesia

Re : Placing Time Deposit

Dear Sir,

Refer to our discussion yesterday about your Time Deposit, with a condition :

- Tenor               :  1 month
- Interest            :  17.50% p.a.
- Payment of Interest :  compound with the principal
- Renewall  Instruction : Automatic Roll  Over  Principal  +
                          Interest

We  guarantee  that  the interest rate will not   change  along  3 (three)  months  (  17.5% p.a. ), after that it  depends  on  the condition.

We  also  guarantee  that the spread between  TT  Buying  and  TT Selling not more than Rp.6,- ( at maturity date ).

As  long  as  you  put your money in Rupiahs  there  will  be  no commission  only transfer fee that you have to pay as Rp.15.000,- if you transfer to Foreign Bank.

But  if  you  put your money in US Dollar and than  you  want  to transfer  to the other Bank, it will be taken commission as  1/8% from total Nominal transfer plus transfer fee as Rp.15.000,-.

Thank for  believing  our company.

Your sincerely,

Onca Maitondang
Cust. Relation Officer

*[handwritten note:]* inithial Payment to DANAMON Bank in Jakarto have is 17.5% Per Cent Compound monthly with PRincial date May 2nd 1996

1



# TOWN OF HUNTINGTON

**JILLIAN GUTHMAN, ESQ. - RECEIVER OF TAXES**
100 MAIN STREET
HUNTINGTON, NY 11743-6990
(631) 351-3217
Email : JGuthman@HuntingtonNy.gov
Website : http://HuntingtonNy.gov

**JUNE 2023**

**PARVIZ LAVI**

10  Auserehl Ct
Huntington NY  11743-22

RE: Tax Map #   **0400-034.00-02.00-015.000**

Bill #   **03   43363**

Location:   **10 AUSEREHL CT**

*Payment of 3 years Taxes*

DEAR PROPERTY OWNE⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯EAL PROPERTY FOR THE
THE RECORDS OF THIS O⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯D. YOU ARE HEREBY NOTIFIED
PROPERTY ASSESSED TO⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯ COUNTY COMPTROLLER AND
THAT PURSUANT TO THE⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯PRIOR TO THE PUBLICATION OF
THAT UNLESS THE UNPA⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯HE TAX LIEN AGAINST YOUR
THE TAX SALE LISTS, WH⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯APERS DESIGNATED TO PUBLISH
REAL PROPERTY WILL B⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯
TAX SALE LISTS THIS YE⋯

SOUTH SHORE PRESS                                   FOR SIX WEEKS

SUFFOLK COUNTY NEWS        20 MEDFORD AVE               FOR SIX WEEKS
                          PATCHOGUE, NY 11772

AND SUCH TAX LIEN WILL BE SOLD PURSUANT TO SUCH ADVERTISEMENT.

**PLEASE DISREGARD THIS NOTICE IF THESE TAXES HAVE BEEN PAID TO THE SUFFOLK COUNTY
COMPTROLLER AFTER MAY 31st WITH ANY APPLICABLE PENALTY AND INTEREST.**

**FOR FURTHER INFORMATION, PLEASE CONTACT THE SUFFOLK COUNTY COMPTROLLER AT
631-852-3000.**

---

(Cut Here)

Assessed Owner :   PARVIZ LAVI
Town of : HUNTINGTON
Suffolk County Tax Map #     **0400-034.00-02.00-015.000**

Total Tax Levied :    **$  21,091.07**  Balance Due of Flat Tax :     **$  21,091.07**    Protested Check Fee Due:     **$   20.00**

| If Paying between : | AMOUNT DUE for 2022-2023 TAX YEAR |
|---|---|
| June 1st* and June 30th* : | 23,274.95 |
| July 1st* and July 31st* : | 23,496.62 |
| August 1st* and August 31st* : | 23,718.28 |

NOTE : Amounts indicated above are for the **2022 - 2023 Tax Year Only**.  If prior years are in arrears, you must contact the
Suffolk County Comptroller (631) 852-3000.

**Return this stub in the enclosed envelope with your payment to :
Suffolk County Comptroller
330 Center Drive
Riverhead, NY  11901**

* Postmark Date                              **Make Check Payable To : Suffolk County Comptroller**

Allied Account Services, Inc.
1065 Stewart Ave #103
Bethpage NY  11714
877-530-5725
Monday- Thursday 8am-9pm EST
Friday 8am-6pm EST
www.alliedaccountservices.com

To: PARVIZ LAVI
10 AUSEREHL CT
HUNTINGTON, NY  11743-2270

Reference: 0716665100
Allied Assigned Account Number: 14059383

6/15/2023



**Allied Account Services is a debt collector. We are trying to collect a debt that you owe to National Grid/long Island Gas. We will use any information you give us to help collect the debt.**

## Our information shows:

You had an account with National Grid/long Island Gas with account number 0716665100.

| | |
|---|---|
| As of 05/10/23 you owed: | $16,186.33 |
| Between 05/10/23 and today: | |
| You were charged this amount in interest: | +$0.00 |
| You were charged this amount in fees: | +$0.00 |
| You paid or were credited this amount toward the debt: | -$0.00 |
| Total amount of the debt now: | $16,186.33 |

**Notice: S**

*Handwritten:*
Payment to
National grid
Gas To be used
at 10 AusuRehl
Court
Huington NY
11743

## How can you dispute the debt?

- **Call or write to us by July 30, 02023, to dispute all or part of the debt.** If you do not, we will assume that our information is correct.

- **If you write to us by July 30, 02023** we must stop collection on any amount you dispute until we send you information that shows you owe the debt. You may use the form below or write to us without the form. You may also include supporting documents. We accept disputes electronically at https://www.alliedaccountservices.com.

## What else can you do?

- **Write to ask for the name and address of the original creditor, if different from the current creditor.** If you write by July 30, 02023, we must stop collection until we send you that information. You may use the form below or write to us without the form. We accept such requests electronically at www.alliedaccountservices.com.

- Go to **www.cfpb.gov/debt-collection** to learn more about your rights under federal law. For instance, you have the right to stop or limit how we contact you.

- Contact us about your payment options.

- Póngase en contacto con nosotros para solicitar una copia de este formulario en español.

503304 • AAS01A • AAS.wfd • 00000353 • Page 1 of 2

---

## How do you want to respond?
*Check all that apply:*

- ☐ **I want to dispute the debt because I think:**
  - ☐ This is not my debt.
  - ☐ The amount is wrong.
  - ☐ Other (please describe on reverse or attach additional information).
- ☐ **I want you to send me the name and address of the original creditor.**
- ☐ **I enclosed this amount:** | $ |

Make your check payable to *Allied Account Services*.
Include the reference number 0716665100.

- ☐ **Quiero este formulario en español.**

ALLIED ACCOUNT SERVICES INC.
1065 STEWART AVE #103
BETHPAGE NY  11714

1065 Stewart Ave #103
Bethpage NY  11714

PARVIZ LAVI
10 AUSEREHL CT
HUNTINGTON, NY  11743-2270

but that because you are his lawyer in this case, I cannot speak directly to him without you there, unless you consent. We then got off the phone.

Will you please let me know whether I should call him back, and whether you consent to my speaking with Mr. Lavi directly (or meeting with him, if that is what he prefers) outside of your presence, as he has requested?

Thanks,

Chris

*MR. Christopher Egleson dated April 16 2021 desire to settle this case ami bachy which my attorny Roben mashal desgred*

**CHRISTOPHER M. EGLESON**
Partner

**SIDLEY AUSTIN LLP**
+1 213 896 6108
cegleson@sidley.com

From: Egleson, Christopher M.
Sent: Friday, April 16, 2021 10:15 AM
To: 'Robin Mashal' <robin@centurylawyer.com>
Cc: Commons, Sean <scommons@sidley.com>; Ruiz, Alexandria V. <aruiz@sidley.com>
Subject: RE: Lavi Litigation - Introduction, Request for Extension

Thanks Robin. I appreciate your going back to him. Since your client is seeking something from our clients, I'd have expected you to start off in a cooperative way. Instead, you and he decided to start off fighting tooth and nail, so that it took a lot of unnecessary time and energy yesterday to reach even this compromise agreement on scheduling, when ordinarily my request for 30 days should have been granted as a matter of course.

I'm sorry that in the end you and he were unwilling to grant us the full amount of time that we requested, even after I pointed out that Judge Fitzgerald specifically admonishes counsel to adhere to the Court's Civility and Professionalism Guidelines, which in turn require attorneys to grant reasonable first requests for extensions of time. We'll of course remember your client's uncooperative approach throughout the case, both on procedural matters and on the substance of his claim. Good luck to him.

 Gmail

Pierre Lavi <plavi3621@gmail.com>

## Danamon bank

11 messages

**PL Gmail** <plavi3621@gmail.com>
To: jjames@us.mufg.jp
Bcc: turbodyn@yahoo.com

Wed, Jul 29, 2020 at 8:37 AM

Dear Mrs James
I should thank you for your kind telcon of today
I have a misunderstanding with Danamon bank
Being  one of your banking institution . I kindly requ...
And mr Steve Cummings or any of his delegates
Hopefully in your presence to resolve my dispute
Based on evidence . With full understanding
That Mitsubishi MUFG has already made commitm...
Towards all creditors and depositors of Danamon
Bank .I appreciate your kind and immediate reply
And with my best personal regards. Pls CFm
Receipt of this email.

Pierre Lavi
Mobile no 5164802000 or 5163498010
Sent from my iPhone

*[handwritten note:] on July 29-2020 MRs Judith James executive assestant to Steve Cummings President of MUFG Union Bank sent me he e mail mR Cummings made Sure that no one*

Jul 29, 2020 at 10:59 AM

**Judith James** <JJames@us.mufg.jp>
To: PL Gmail <plavi3621@gmail.com>

Hello Mr. Lavi,

Please accept this reply as confirmation of receipt of your email.

A representative from our office will be in contact with you in regards to your message.

Thank you and best regards,

Judith A. James
Executive Assistant to Steve Cummings
President & Chief Executive Officer
MUFG Union Bank, N.A.
1251 Avenue of the Americas
New York, NY 10020
T:+1 212-782-4020
jjames@us.mufg.jp

*[handwritten note:] Contact me any more. I had sent about 1000 emals all never Rejhed to mR steve Coming and New PResident of MUFG MR KEVIN CoRoNIN never Rejhed*

*[handwritten:] 212-782-6800*

**From:** PL Gmail <plavi3621@gmail.com>
**Sent:** Wednesday, July 29, 2020 8:37 AM
**To:** Judith James
**Subject:** [External] Danamon bank

External email: Please be careful whe...
[Quoted text hidden]

This email is confidential, and your receipt o... is subject to the recipient terms appearing at:
https://www.mufgamericas.com/emailrecipientterms . If you have received this email in error, please inform us by email

# AFFIDAVIT

Undersigned, Aicha Benabdalllah, having passport no. 153186447 issued in Algeria (valid until 12 September 2025), secretary of Mr. Pierre Lavi, under penalty of perjury testifies to the followings and in case it will be required shall testify to the same in the court of law, based on my own personal knowledge.Mr. Lavi was invited by Mr. Herry Kriswanto, branch manager of Kibon Sirih in Jakarta, met the following people on 6 November 2018 at Danmaon Bank, Kibon Sirih branch;

Mr. Kriswanto presented us to Gregorius Saminoe as attorney for Danamon Bank,
Mrs. Yoanita, customer care service of Danamon Bank,
Mrs. Pipi Sumanti area manager of Danamon Bank.


We started the meeting at 10:00 am while Mr. Saminoe asked Mr. Lavi to provide him all documentation so that the dispute between Pierre Lavi and Danamon Bank will be resolved. Mr. Lavi requested Mr. Saminoe to write his name, profession and mobile number, the same from Mrs. Yoanita which they did as per attached document.

From 10:00 am until 1:00 pm in the afternoon, three hours, Mr. Saminoe went through all the files of Pierre Lavi, being many faxes as well as some registered letters confirming to Danamon Bank that at all times his deposit both in rupiah as ell as us dollars should bear an interest of 17.5% for rupiah account and 8.5% on US dollar account.

It was understood that as attached document dated 2 May 1996 Mr. Lavi had deposited $500,000, to Danamon Bank which had been converted to rupiah bearing the interest of 17.5% per annum compounded monthly. Moreover it was understood that on 2 May 1997 Mr. Lavi from New York has asked Danamon Bank to change his deposit in rupiahs to US dollars, which was effected bearing 8.5% interest compounded monthly.

After three hours and review of all the documentation of Pierre Lavi (faxes, registered letters), Mr. Saminoe asked Mr. Kriswanto whether Danamon Bank has ever rejected the requirement of Pierre Lavi regarding the interest rate. The reply was no. Then Mr. Saminoe asked Mr. Kriswanto to calculate the balance of the rupiah account and it should be paid to Mr. Lavi on Friday of that week.

Mr. Kriswanto claimed that he should be in Bali on Friday and will not have enough time to calculate the difference. Mrs. Nancy Sandarino of head office had already calculated a part of such rupiah account, being about 2,200,000,000 rupiah which had been paid on 6 February 2018. Mr. Saminoe asked Mr. Kriswanto to send a text message to Ms. Nancy to calculate and pay on coming Friday the balance of the amount in rupiah account.

I was with Mr, Lavi who called Ms. Nancy several times later in the afternoon as well as the next day but there has not been any reply. In the meantime Mr. Saminoe requested Pierre Lavi to provide him the calculation of the difference which should be paid. Mr. Lavi provided him three pages of documents which were calculated in New York by accountant of Pierre Lavi.

According to the three pages initially the amount due on the rupiah account as of 2 May 1997 was 371,754,765.25 rupiah. At 17.5% per annum compounded monthly such amount will be

16,132,142,494.14 Indonesian rupiah, through up to 2 February 2019 which should be paid to Mr. P. Lavi.

During this period there were some discussions about the payment due to P. Lavi on account of his deposit in US dollars. Mr. Kriswanto claimed that based on the documentation sent to Mr. Lavi a few months after their meeting, which took place in February 2018 the amount of $458,000. Had been sent to the credit account of Mr. Edmond Lavi in his bank, Washington Mutual, in Los Angeles but Mr. Kriswanto was not in position to show the following facts;

1. Copy of the deposit of the above amount to Mr. Edmond Lavi on or about 26 April 2004.
2. Any verifiable documents that indeed Danamon Bank has instructed officially JP Morgan Chase in New York to transfer such amount.
3. Any approval from Chase that such money had been transferred to the account of Edmond Lavi with Washington Mutual because Washington Mutual had changed the account number of Edmond Lavi when initial instruction of P. Lavi had been given to Danamon Bank in January 2004 while Danamon claims that such transfer has been made on 26 April 2004.
4. Danamon Bank refused to show the ledger of transaction between Danamon and JP Morgan Chase during 26 April 2004.

This matter was not resolved until such verifiable documents will not be shown or provided to Mr. Pierre Lavi.

Mr. Kriswanto promised that when he comes back from his trip to Bali he would settle this account as well. It should be understood that we had another meeting in Kibon Sirih while Mr. Lavi has sent faxes to Temasack Holdings in Singapore whereas Temasack Hodings had instructed Mrs. Henney, General Area Manager of Danamon Bank to settle this matter amicably with Mr. Lavi.

After review of documentation it was found out that on 2 May 1997 the exchange value of rupiah against US dollars was 2,400 rupiah whereas Danamon Bank had miscalculated such rate. Therefore as of 2 May 1997 Pierre Lavi had $416,666.00 deposit with Danamon Bank.

_____

Aicha Benhabdallah


Attachments:

1. Danamon Bank deposit dated 2 May 1996
2. Danamon Bank document 7666229 dated 2 May 1996 amounting to 1,162,000,000. rupiah (exchange of $500,000. deposit)
3. Letter dated 6 November 2018, Danamon Bank confirming the names, mobile numbers of Mr. Samione, Mrs. Yoanita, Mr. Herry
4. Three page calculation of Ambrosio & Bellotti CPA of Melville, New York
5. Payment of the amount due in US dollars as per Ambrosio & Bellotti CPA of Melville, New York

No. 3966394

**Jenis Bantuan**

**Tanggal | Date** 26/4/04

**Dikirim dengan | Sent by** ☐ B. Draft / SPKU  ☐ LLG  ☐ RTGS  ☐ TT
☐ Pemindahbukuan | Over Booking

**Cabang | Branch**

**Validasi | Validation**

Fake Document
Sent to me on
28 April 2004
By Criminal
KRIS WANTO
margen of Kebon
Sireh Jakarta
this Criminal had
copy of my Invitation
on his hand date
March 2004

**Pembayaran dengan | Payment**
☐ Tunai | Cash
☐ Debet Rekening Saya | Debit My / Our Acc. No.
☐ Warkat Sendiri | Kliring No. | In House | Clearing Check No.

**Bank:** ☐ IDR  ☐ USD  ☐

**Jenis Mata Uang | Type of Currency**

**Data Penerima | Beneficiary Data**

**Nama | Name** MR. EDMUND LAVI

**Status | Status**
☐ Penduduk | Resident  ☐ Bukan Penduduk | Non-Resident
**Jenis Identitas | Type of Identity**
☐ KTP  ☐ SIM  ☐ Paspor | Passport  ☐ KIMS  ☐ KITTAS

**No. Identitas | Identity No.** 3 1 3 0 2 9 4 7

**Alamat | Address**

**Telepon | Phone No.**

**No. Rekening Tujuan | Destination A/c. No.**

**Bank | Bank**

**Kota / Negara Tujuan | City / Country**  **Cabang | Branch**

**Data Pengirim ( wajib diisi lengkap jika bukan Nasabah )**
**Remitters Data ( Should be filled in by non Customer )**

**Nama | Name** MR. PIERRE LAVI

**Status | Status**
☐ Penduduk | Resident  ☐ Bukan Penduduk | Non-Resident
**Jenis Identitas | Type of Identity**
☐ KTP  ☐ SIM  ☐ Paspor | Passport  ☐ KIMS  ☐ KITTAS

**No. identitas | Identity No.**

**Alamat | Address**

**Telepon | Phone No.**

| Berita | Message | | Valuta Asing | Foreign Currency | Kurs | Rate | Rupiah |
|---|---|---|---|---|
| Rincian | Detail | | | | |
| Jumlah yang Ditransfer | Amount of Transfer | | USD. 450.000 | | |
| Komisi | Commission | | | | |
| Biaya | Charges | | USD. 50 | | |
| Jumlah | Total | | USD. 450.010 | | |
| Terbilang | Say | | | | |

**Tanda Tangan dan Nama Lengkap Pengirim**
**Signature and Name of the Applicant**

Atas biaya dan resiko saya / kami dan tanpa perkecualian jawaban dari Bank dan sesuai dengan Ketentuan Umum yang tercantum di sebelah ini yang telah saya / kami baca, mengerti dan disetujui, harap Bank menerbitkan wesel / melaksanakan transfer / pemindahbukuan sebagaimana diuraikan di atas. For my / our account and risk, without any responsibility or liability to Bank and to be terms as written subject to the general on the reverse which I / we have read, understood and agreed, please Bank issued draft / effect transfer as detailed above.

*) Coret salah satu
Choose one

**Diisi oleh Bank | For Bank Use Only.**

| | Paraf | Inital | Tanggal | Date |
|---|---|---|---|
| Diperiksa oleh | Checked by | | | |
| Disetujui oleh | Approved by | | | |

ATP/007/05/2002  BKJ

1   *Lewis v. Verizon Commc'ns, Inc.*, 627 F.3d 395, 400 (9th Cir. 2010) ("The amount in

2   controversy is simply an estimate of the total amount in dispute, not a prospective

3   assessment of defendant's liability.").

4   **III.     Federal Question Jurisdiction Exists Under 28 U.S.C. § 1331**

5          20.    Plaintiff's First Amended Complaint presents an embedded federal

6   question. "A case 'aris[es] under' federal law within the meaning of § 1331 . . . if 'a

7   well-pleaded complaint establishes either that federal law creates the cause of action

8   or that the plaintiff's right to relief necessarily depends on resolution of a substantial

9   question of federal law.'" *Empire Healthchoice v. McVeigh*, 547 U.S. 677, 689-90

10  (2006) (quoting *Franchise Tax Bd. v. Laborers Vacation Trust*, 463 U. S. 1, 27-28

11  (1983)).  Plaintiff alleges that Defendant Danamon mailed a fabricated document to

12  him and that "[d]elivery" of that document "through the mail was mail fraud, pursuant

13  to 18 U.S. Code § 1341." FAC ¶ 15.

14         21.    This allegation is incorporated by reference in to each of Plaintiff's

15  causes of action and requests for relief.  Further, in setting forth his claim for

16  restitution and the imposition of a constructive trust, Plaintiff alleges that Defendants

17  have "profited from their wrongful and fraudulent acts as described above," which

18  includes the claim of mail fraud.  Resolution of the claim Plaintiff has pleaded for

19  restitution and constructive trust will therefore require resolution of, *inter alia*,

20  Plaintiff's express allegation of an act of mail fraud in violation of 18 U.S.C. § 1341.

21  In seeking exemplary or punitive damages in connection with his claim for

22  conversion, Plaintiff also claims that the "acts alleged above" were "taken with the

23  intent to defraud," and thereby also predicates his claim for punitive or exemplary

24  damages on, *inter alia*, his allegation of an act of mail fraud in violation of 18 U.S.C.

25  § 1341.

26

27

28

1   he sought to recover of these funds, but that he was unsuccessful, and therefore brings

2   this action to recover at least $4 million.

3     12. This Court has subject matter jurisdiction over this removed action under

4   both the diversity jurisdiction statute, 28 U.S.C. § 1332(a)(2), because the parties are

5   completely diverse; and the federal question jurisdiction statute, 28 U.S.C. § 1331,

6   because Plaintiff's claim expressly presents an embedded federal question.  Removal

7   is proper under 28 U.S.C. §§ 1441 and 1446.

8   **II. Diversity Jurisdiction Exists Under 28 U.S.C. § 1332(a)(2).**

9     13. Federal district courts have subject matter jurisdiction over "all civil

10  actions where the matter in controversy exceeds the sum or value of $75,000,

11  exclusive of interest and costs, and is between . . . citizens of a State and citizens or

12  subjects of a foreign state." 28 U.S.C. § 1332(a)(2).  Both requirements are satisfied

13  here because (a) the parties are completely diverse and (b) the amount in controversy

14  exceeds $75,000.

15    **A. The Parties are Completely Diverse.**

16    14. Under 28 U.S.C. § 1332(a)(2), an action must be between "citizens of a

17  State and citizens or subjects of a foreign state."  The parties to this case are

18  completely diverse.

19    15. Upon information and belief, Defendants allege that Plaintiff is a citizen

20  of the United States.  *See, e.g., Dart Cherokee Basin Operating Co., LLC v. Owens*,

21  135 S. Ct. 547, 553-54 (2014) (affirming that good faith allegations of amount in

22  controversy made on information and belief are sufficient to support removal

23  grounded in diversity jurisdiction); *Ehrman v. Cox Communications, Inc.*, 932 F.3d

24  1223, 1226 (9th Cir. 2019) (holding a removal party "d[oes] not have to explain why

25  it believe[s]" diversity exists); *see also, e.g., Lewis v. Rego Co.*, 757 F.2d 66, 68–69

26  (3d Cir. 1985) (permitting removing party, in notice of removal, to allege citizenship

27  of other parties on information and belief in order to establish diversity); *Carolina*

28

*Cas. Ins. Co. v. Team Equip., Inc.*, 741 F.3d 1082, 1087 (9th Cir. 2014) (permitting same with respect to a plaintiff's complaint, citing *Lewis* with approval).

    a.    Public sources indicate that an individual of Plaintiff's name and age, Pierre Lavi (a/k/a Parviz Lavi), age 85, maintains an address and has for many years resided in Nassau County, New York. Defendants have not identified any other individual of that name in the United States. Defendants therefore believe and allege that Plaintiff is Pierre Lavi of Nassau County, New York and is domiciled in New York.

    b.    According to a public profile for Pierre Lavi on the networking website LinkedIn.com, Plaintiff was the founder and manager, in 1974, of a New York industrial company called Omega Industries, later renamed Turbo Dynamics Corp.

    c.    Public sources show that Mr. Lavi of New York, identified as an employee of Turbo Dynamics Corp., has made financial contributions to political campaigns in the United States. These include, *inter alia*, contributions to the campaign of a U.S. congressman representing a congressional district in Nassau County.

    d.    Plaintiff alleges that he initially deposited funds in U.S. currency (FAC ¶ 10), purportedly withdrew funds in U.S. currency (*id.* ¶¶ 12, 16), and describes the U.S. as "home" (*id.* ¶ 15).

    e.    Based upon his longtime residence in the United States, longtime ownership and management of a U.S. business, transactions in U.S. currency, contributions to U.S. political campaigns, and choice of a U.S. forum in which to litigate, Defendants are informed and

4

believe, and therefore allege, that Plaintiff is a citizen of the United States.

16.     Defendants are citizens of foreign states. "[A] corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business." 28 U.S.C. § 1332(c)(1). Defendants MUFG and MUBK are each organized under the laws of Japan and are headquartered in and have their principal places of business in Japan, and therefore are citizens of Japan for purposes of diversity. Defendant Danamon is organized under the laws of Indonesia and is headquartered in and has its principal place of business in Indonesia, and therefore is a citizen of Indonesia for purposes of diversity. No Defendant is a citizen any State in the United States.

17.     The First Amended Complaint additionally names John Doe defendants, but these are disregarded for purposes of diversity jurisdiction. *See* 28 U.S.C. § 1441 ("In determining whether a civil action is removable on the basis of the jurisdiction under section 1332(a) of this title, the citizenship of defendants sued under fictitious names shall be disregarded.").

**B.     Plaintiff Expressly Seeks Damages of More Than $75,000.**

18.     Under 28 U.S.C. § 1332(a), the amount in controversy must "exceed[] the sum or value of $75,000." Plaintiff's First Amended Complaint seeks damages "in no event less than $4,000,000," so the amount in controversy requirement is satisfied. *See Chavez v. JPMorgan Chase & Co.*, 888 F.3d 413, 416 (9th Cir. 2018) (holding good faith concession by plaintiff about amount in controversy must be accepted for jurisdictional purposes).

19.     Although determining the amount in controversy requires assuming that the First Amended Complaint's allegations are true, Defendants do not waive any defenses to any claims, and, further, deny that Plaintiff is entitled to any relief. *See*

5

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
#### Washington, D.C. 20549

## Form 6-K

### Report of Foreign Private Issuer
### Pursuant to Rule 13a-16 or 15d-16 under
### the Securities Exchange Act of 1934

#### For the month of June 2019

#### Commission File No. 000-54189

# MITSUBISHI UFJ FINANCIAL GROUP, INC.
#### (Translation of registrant's name into English)

#### 7-1, Marunouchi 2-chome, Chiyoda-ku
#### Tokyo 100-8330, Japan
#### (Address of principal executive office)

#### Indicate by check mark whether the registrant files or
#### will file annual reports under cover of Form 20-F or Form 40-F.

Form 20-F __X__    Form 40-F _____

#### Indicate by check mark if the registrant is submitting the Form 6-K
#### in paper as permitted by Regulation S-T Rule 101(b)(1):

#### Indicate by check mark if the registrant is submitting the Form 6-K
#### in paper as permitted by Regulation S-T Rule 101(b)(7):

THIS REPORT ON FORM 6-K SHALL BE DEEMED TO BE INCORPORATED BY REFERENCE IN THE REGISTRATION STATEMENT ON FORM F-3 (NO. 333-229697) OF MITSUBISHI UFJ FINANCIAL GROUP, INC. AND TO BE A PART THEREOF FROM THE DATE ON WHICH THIS REPORT IS FURNISHED TO THE U.S. SECURITIES AND EXCHANGE COMMISSION TO THE EXTENT NOT SUPERSEDED BY DOCUMENTS OR REPORTS SUBSEQUENTLY FILED WITH OR FURNISHED TO THE U.S. SECURITIES AND EXCHANGE COMMISSION.

FORM 6-K



**9.**     **Risks accompanying the expansion of our operations and the range of products and services**

We are expanding the range of our business operations, including those of our subsidiaries and affiliates, on a global basis to the extent permitted by applicable laws and regulations and other conditions. As we expand the range of our business operations, we will be exposed to new and increasingly complex risks. There may be cases where our experience with the risks relating to such expanded business operations is non-existent or limited. With respect to operations that are subject to volatility in the business environment, while large profits can be expected on the one hand, there is a risk of incurring large losses on the other. With respect to such expanded business operations, if we do not have appropriate internal control and risk management systems in place and also do not have sufficient capital commensurate with the associated risks, our financial condition and results of operations may be adversely affected. Furthermore, if the expansion of our business operations does not proceed as expected, or if the profitability of such business operations is adversely affected by intense competition, we may not succeed in our efforts to expand our range of business operations.

**10.**     **Risks relating to the exposures to emerging market countries**

We are active in countries in Asia, Latin America, Central and Eastern Europe, the Middle East and other emerging market countries through a network of branches and subsidiaries and are exposed to a variety of credit and market risks associated with these countries. For example, depreciation of local currencies in these countries may adversely affect the creditworthiness of some of our borrowers in these countries. The loans we have made to borrowers in these countries are often denominated in U.S. dollars, Euro or other foreign currencies. These borrowers often do not hedge the loans to protect against fluctuations in the values of local currencies, and the depreciation of the local currency may make it difficult for borrowers to pay their debts to us and other lenders. In addition, some of these countries in which we operate may attempt to support the value of their currencies by raising domestic interest rates. If this happens, the borrowers in these countries would have to devote more of their resources to repaying their domestic obligations, which may adversely affect their ability to repay their debts to us and other foreign lenders. If these issues and related issues result in limited credit availability, it will adversely affect economic conditions in some countries and cause further deterioration of the credit quality of borrowers and banks in those countries, and as a result, it may cause us to incur losses.

In addition, in each country and region, we are exposed to risks specific to that country and region and risks that are common, including political and social instability, terrorism and other conflicts, which may cause us to incur losses or suffer other adverse effects.

–8–

**11.   Risks relating to MUFG Americas Holdings**

Any adverse changes to the business or management of MUFG Americas Holdings, one of our major overseas subsidiaries, may negatively affect our financial condition and results of operations. Factors that may negatively affect MUFG Americas Holdings' financial condition and results of operations include adverse economic conditions, including a downturn in the real estate and housing industries in the United States, particularly in California, substantial competition in the banking market in the United States, uncertainty over the U.S. economy, the threat of terrorist attacks, fluctuating prices of oil and other natural resources and additional credit costs incurred as a result of such fluctuations, sudden fluctuations in interest rates, restrictions due to U.S. financial regulations, losses from litigation, credit rating downgrades and declines in stock prices of our borrowers, bankruptcies of companies that may occur because of these factors and costs arising because of internal control weaknesses and an inadequate compliance framework at MUFG Americas Holdings and its subsidiaries.

**12.   Risks relating to Krungsri or Bank Danamon**

Any adverse changes to the business or management of Bank of Ayudhya Public Company Limited, or Krungsri, or PT Bank Danamon Indonesia, Tbk, or Bank Danamon, our major overseas subsidiaries, may negatively affect our financial condition and results of operations. Factors that may negatively affect financial condition and results of the operations of these subsidiaries include:

- adverse economic conditions, substantial competition in the banking industry, volatile political and social conditions, natural disasters including floods, terrorism and armed conflicts, restrictions under applicable financial systems and regulations, or significant fluctuations in interest rates, currency exchange rates, stock prices or commodity prices, in Southeast Asia, particularly in their respective home markets,

- the business performance of companies making investments in and entering into markets in the Southeast Asian region, as well as the conditions of economies, financial systems, laws and financial markets in the countries where such companies primarily operate,

- losses from legal proceedings involving them,

- credit rating downgrades and declines in stock prices of their borrowers, and bankruptcies of their borrowers resulting from such factors,

- defaults on their loans to individuals, and

- costs incurred due to weaknesses in their or any of their subsidiaries' internal controls and regulatory compliance systems.

**13.   Risks relating to our consumer lending business**

We have subsidiaries and affiliates in the consumer finance industry as well as loans outstanding to consumer finance companies. The results of recent court cases, including the strict interpretation of the requirements for deemed payment, or "*minashi bensai*," have made a borrower's claim for reimbursement of previously collected interest payments in excess of the limits stipulated by the Interest Rate Restriction Law easier, and as a result, there have been a significant number of such claims. In addition, beginning in December 2007, amendments to the Law Concerning Lending Business came into effect in phases, and in June 2010, amendments abolishing the deemed payment system and limiting the total amount that individuals can borrow, among others, became effective. At the same time, an amendment to the Law Concerning Acceptance of Investment, Cash, Deposit and Interest Rate, etc. became effective, reducing the maximum permissible interest rate under a loan agreement from 29.2% per annum to 20% per annum. The business environment for the consumer finance industry continues to require close monitoring as a large number of consumer finance companies, including major consumer finance companies, have failed. If our subsidiaries and affiliates in the consumer finance industry are adversely affected by various factors including those described above, our financial condition and results of operations may be adversely affected. In addition, if our borrowers in the consumer finance industry are adversely affected by the factors described above, our loans to the consumer finance companies may be impaired.

–9–



**17.    Business Combinations**

None.

(Additional information)

(Acquisition of shares of firm)

On October 31, 2018, Mitsubishi UFJ Trust and Banking Corporation ("the Trust Bank"), a consolidated subsidiary of MUFG, entered into a Share Sale Deed with Australian financial group Commonwealth Bank of Australia ("CBA") and its wholly-owned subsidiary Colonial First State Group Limited (the "Seller") to acquire 100% of the shares in each of nine subsidiaries of the Seller, which collectively represent CBA's global asset management business known as Colonial First State Global Asset Management ("CFSGAM"), from the Seller (the "Proposed Transaction"), subject to applicable regulatory and other approvals and certain other conditions.

I.    Objectives of the transaction

MUFG has stated in the current Medium-Term Business Plan that its Asset Management & Investor Services Business Group aims to become "the unparalleled industry leader in Japan as well as a global player boasting significant presence overseas". To achieve this goal of becoming a major player in the global asset management market, MUFG has been pursuing growth through inorganic investments, while endeavoring to enhance its asset management capabilities and product competitiveness, with the Trust Bank being the core subsidiary in the Business Group.

CFSGAM offers a wide range of products including equities, fixed income and alternatives, and has specialist capabilities in Asian and emerging equity markets, alternatives (property and infrastructure), as well as passive and other products. Through this Proposed Transaction, MUFG expects to be able to meet various client needs by expanding its product lineup and enhancing its presence as one of the largest asset management firms in the Asia and Oceania region. MUFG aims to work together with CFSGAM to continue delivering value to our current and future clients.

II.    Name of the Seller in the Proposed Transaction

Colonial First State Group Limited

III.    Names, business description and scale of the entities to be acquired

| | |
|---|---|
| (1) Names | Colonial First State Asset Management (Australia) Limited |
| | Colonial First State Infrastructure Holdings Limited |
| | Colonial First State Managed Infrastructure Limited |
| | First State Investment Managers (Asia) Limited |
| | First State Investments (UK Holdings) Limited |
| | First State Investments (US) LLC |
| | Realindex Investments Pty Limited |
| | CFSGAM IP Holdings Pty Limited |
| | CFSGAM Services Pty Ltd |
| (2) Business description | Asset Management, etc. |
| (3) Assets under management | AUD 212.4 billion (as of June 30, 2018) |
| (4) Operating income | AUD 343 million (for the fiscal year ended June 30, 2018) |

IV.    Expected date of the stock acquisition

MUFG expects to close the Proposed Transaction in the middle of 2019.

V.    Acquisition price and the ratio of equity interest after the acquisition

Subject to the satisfaction of conditions precedent (including obtaining necessary regulatory approvals) set out in the Share Sale Deed, the Trust Bank expects to acquire a 100% equity interest in each of the CFSGAM entities for a total acquisition price of approximately AUD 4.0 billion.

–90–

20. **Subsequent Events**

I. PT Bank Danamon Indonesia, Tbk. became a consolidated subsidiary through additional share acquisition

On April 29, 2019, MUFG Bank, Ltd. ("the Bank"), a consolidated subsidiary of MUFG, acquired an additional 54.0% equity interest (5,174,089,400 shares) in PT Bank Danamon Indonesia, Tbk. ("Danamon"), from Asia Financial (Indonesia) Pte. Ltd. and other shareholders, based on a price of IDR 9,590 (approximately USD 0.68 / approximately ¥77) per share at an aggregate investment amount of IDR 49,620 billion (approximately USD 3.51 billion / approximately ¥397 billion).

In addition, the Bank acquired an additional 92.1% equity interest (736,578,439 shares) in PT Bank Nusantara Parahyangan, Tbk. ("BNP") from ACOM CO., LTD., a consolidated subsidiary of MUFG, and other shareholders, based on a price of IDR 4,088 (approximately USD 0.29 / approximately ¥33) per share at an aggregate investment amount of IDR 3,011 billion (approximately USD 0.21 billion / approximately ¥24.1 billion). As a result of the Bank holding 94.0% shares of Danamon and 99.9% shares of BNP, Danamon and BNP became consolidated subsidiaries of both MUFG and the Bank.

In addition, Danamon and BNP completed an absorption-type merger on May 1, 2019, in which Danamon was the surviving bank and BNP was the absorbed bank. In connection with this merger, the Bank acquired 188,908,055 ordinary shares of Danamon in exchange for the BNP shares which the Bank had, and the amount of the Bank's ordinary shares of Danamon became 9,196,854,792 which is equivalent to a 94.1% equity interest in Danamon.

The objectives and outline of the transactions are described in "Equity method applied to Danamon due to additional share acquisition" of "Additional information" in "II. Application of the equity method" above.

Financial summary of Danamon for the fiscal year ended December 31, 2018:

|  | (millions of IDR) |
|---|---|
| Operating income: | 23,868,444 |
| Net operating income: | 5,158,037 |
| Net income attributable to shareholders: | 3,922,172 |
| Total assets: | 186,762,189 |
| Net equity: | 41,939,821 |

(Notes)
1. "Operating income" refers to the total of "Interest income" and "Other operating income."
2. The above figures are presented based on Regulation of Financial Service Authority ("POJK") No. 6/POJK.03/2015 dated 31 March 2015 regarding "Transparency and Publication of Bank Reports" and its amendment of POJK No. 32/POJK.03/2016 dated 8 August 2016, and the Copy of Circular Letter of Financial Service Authority ("SEOJK") No. 43/SEOJK.03/2016 dated 28 September 2016.

−100−

**P. Lavi**
**2verbrook Lane, Glen Head, New Yor**
**: plavi3621@gmail.com • T: +1.516.**

*letter to attention
of Temaseck
holding owen of
Danamon Bank
befor was sold
to mitsulichi
MUFG*

November 15, 20

For the Kind and Immediate Attention
Mr. Lee Thing Hiat, CEO Temaseck International
Mrs. Ho Ching
Mr. Simon Israel

With reference to my fax dated 12 November 2018, I should indeed thank you for instructing Mrs. Henny Gunawau, Regional Manager no. 2 of Danamon Bank to meet with me from 10am until 3pm in the afternoon. Unfortunately as she was not aware of the facts and many communications which I had with the your bank since 1997 we could not come to any amicable resolution.

I respectfully request you to note the following;

According to documentation which Bank Danamon has received on or about 1 May 1997 I have requested Bank of Danamon to change one billion of my rupiah account to United States dollars. Today in our meeting I found out that the exchange rate at that time was 2,400 rupiah per US dollar. The exchange was effected and I should had the amount of $400,666.00 in my US account. In that respect I had talked to Ms. Novi of your bank, I had sent a fax on 11 November 2002 reconfirming that on 2 May 1996 I have deposited with Bank Danamon $500,000. which had been changed to rupiah at 17.5% interest monthly compounded. At the time of deposit I was talking to Ms. Once of your bank who confirmed that although the account will be for three months but in case you keep in your rupiah account until you withdraw the same rate and terms of payment shall apply. Moreover in case you change your account in US dollars the interest rate will change. That was my understanding at that time.

To make sure that I will not have any misunderstanding with your esteemed bank on 13 November 2002 by registered letter as herewith attached and by fax I sent three page letter reconfirming that the interest should be 17.5% monthly compounded and in May 1997 when I asked by fax and by telephone to exchange one million of my rupiah account to US the rate of interest should be 8.5% monthly compounded until it is fully paid. My discussion with Ms. Novi was on 2 May 1997. The exchange rate on the time of my discussion was 2,400 rupiah per US dollar. Therefore my one billion rupiah was US $416,666. based on the finding of Ms. Henny Gunawau, Regional Manager no. 2.

According to Bank Danamon letter dated 2 May 1996 which I am attaching herewith enclosed I was not supposed to pay any commission to the bank in case I keep my deposit in rupiah. In respect of my deposit in US dollars I was supposed to pay 1/8 % of amount. Your bank has charged me twenty percent commission (taxes) whereas in other communications I have confirmed to them that Ms. Once at the time which I deposited when I asked what is the meaning of commission she explained taxes.

MITsubishi



**Danamon**

CERTIFICATION REGARDING CORRESPONDENT ACCOUNTS FOR FOREIGN BANKS

[OMB CONTROL NUMBER 1506-0043]

*The information contained in this Certification is sought pursuant to Sections 5318(j) and 5318(k) of Title 31 of the United State Code, as added by sections 313 and 319(b) of the USA PATRIOT Act of 2001 (Public Law 107-56).*

This Certification should be completed by any foreign bank that maintains a **correspondent account** with any U.S. bank or broker-dealer in securities (a **covered financial institution** as defined in 31 CFR 1010.605(e)). An entity that is not a foreign bank is not required to complete this Certification.

A **foreign bank** is a bank organized under foreign law and located outside of the United States (see definition at 31 CFR 1010.100(u)). A **bank** includes offices, branches, and agencies of commercial banks or trust companies, private banks, national banks, thrift institutions, credit unions, and other organizations chartered under banking laws and supervised by banking supervisors of any state (see definition at 31 CFR 1010.100(d)).1

A **correspondent account** for a foreign bank is any account to receive deposits from, make payments or other disbursements on behalf of a foreign bank, or handle other financial transactions related to the foreign bank.

*Special instructions for foreign branches of U.S. banks:* A branch or office of a U.S. bank outside the United State is a foreign bank. Such a branch or office is not required to complete this Certification with respect to Correspondent Accounts with U.S. branches and offices of the same U.S. bank.

*Special instructions for covering multiple branches on a single Certification:* A foreign bank may complete one Certification for its branches and offices outside the United States. The Certification must list all of the branches and offices that are covered and must include the information required in Part C for **each** branch or office that maintains a Correspondent Account with a Covered Financial Institution. Use attachment sheets as necessary.

**A.** The undersigned financial institution, <u>PT. Bank Danamon Indonesia</u> ("**Foreign Bank**") hereby certifies as follows:

*Registeration of Danamon Bank as Foreing Bank with SEC OMB Control No 1506- 0043 4 Pages.*

1 A "foreign bank" ... ... ...uthority that functions as a central bank,
or any internatio... ... ...med by treaty or international
agreement.

MITsubishi
BADLey Sharp

**B. Correspondent Accounts Covered by this Certification:** Check one box.

☑ This Certification applies to all accounts established for Foreign Bank by Covered Financial Institutions.

☐ This Certification applies to Correspondent Accounts established by _____ (name of Covered Financial Institution(s)) for Foreign Bank.

**C. Physical Presence/Regulated Affiliate Status:** Check one box and complete the blanks.

☑ Foreign Banks maintains a **physical presence** in any country. That means:
- Foreign Bank has a place of business at the following street address: <u>JL. HR. Rasuna Said Kav C-10 Jakarta Selatan 12940</u>, where Foreign Bank employs one or more individuals on a full-time basis and maintains operating records related to its banking activities.
- The above address is in <u>Indonesia</u> (insert country), where Foreign Bank is authorized to conduct banking activities.
- Foreign Bank is subject to inspection by <u>Otoritas Jasa Keuangan,</u> (insert Banking Authority), the banking authority that licensed Foreign Bank to conduct banking activities.

☐ Foreign Bank does not have a physical presence in any country, but Foreign Bank is a **regulated affiliate**. That means:
- Foreign Bank is an affiliate of a depository institution, credit union, or a foreign bank that maintains a physical presence at the following street address: _____, where it employs one or more persons on a full-time basis and maintains operating records related to its banking activities.
- The above address is in _____ (insert country), where the depository institution, credit union, or foreign bank is authorized to conduct banking activities.
- Foreign Bank is subject to supervision by _____, (insert Banking Authority), the same banking authority that regulates the depository institution, credit union, or foreign bank.

☐ Foreign Bank does **not** have a physical presence in a country and is **not** a regulated affiliate.

**D. Indirect Use of Correspondent Accounts:** Check box to certify.

☑ No Correspondent Account maintained by a Covered Financial Institution may be used to indirectly provide banking services to certain foreign banks. Foreign Bank





hereby certifies that it does **not** use any Correspondent Account with a Covered Financial Institution to indirectly provide banking services to any foreign bank that does not maintain a physical presence in any country and that is not a regulated affiliate.

**E. Ownership Information:** Check box 1 or 2 below, **if applicable.**

☐ 1. Form **FR Y-7 is on file.** Foreign Bank has filed with the Federal Reserve Board a current Form FR Y-7 and has disclosed its ownership information on Item 4 of Form FR Y-7.

☑ 2. Foreign **Bank's shares are publicly traded.** Publicly traded means that the shares are traded on an exchange or an organized over-the-counter market that is regulated by a foreign securities authority as defined in section 3(a)(50) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(50)).

If **neither** box 1 or 2 of Part E is checked, complete Item 3 below, **if applicable.**

☐ 3. Foreign Bank has no **owner(s)** except as set forth below. For purposes of this Certification, **owner** means any person who, directly or indirectly, (a) owns, controls, or has power to vote 25 percent or more of any class of voting securities or other voting interests of Foreign Bank; or (b) controls in any manner the election of a majority of the directors (or individuals exercising similar functions) of Foreign Bank. For purposes of this Certification, (i) **person** means any individual, bank, corporation, partnership, limited liability company or any other legal entity; (ii) **voting securities or other voting interests** means securities or other interests that entitle the holder to vote for or select directors (or individuals exercising similar functions); and (iii) members of the same family 2 shall be considered one **person.**

| Name | Address |
|------|---------|
|      |         |
|      |         |
|      |         |

---

2 The same family means parents, spouses, children, siblings, uncles, aunts, grandparents, grandchildren, first cousins, stepchildren, stepsiblings, parents-in-law and spouses of any of the foregoing. In determining the ownership interests of the same family, any voting interest of any family member shall be taken into account

**F. Process Agent:** complete the following.

The following individual or entity: C T Corporation is a resident of the United States at the following street address: 111 8th Ave # B, New York, 10011, and is authorized to accept service of legal process on behalf of Foreign Bank from the Secretary of the Treasury or the Attorney General of the United States pursuant to Section 5318(k) of title 31, United States Code.

**G. General**

Foreign Bank hereby agrees to notify in writing each Covered Financial Institution at which it maintains any Correspondent Account of any change in facts or circumstances reported in this Certification. Notification shall be given within 30 calendar days of such change.

Foreign Bank understands that each Covered Financial Institution at which it maintains a Correspondent Account may provide a copy of this Certification to the Secretary of the Treasury and the Attorney General of the United States. Foreign Bank further understands that the statements contained in this Certification may be transmitted to one or more departments or agencies of the United States of America for the purpose of fulfilling such departments' and agencies' governmental functions.

I, Rita Mirasari (name of signatory), certify that I have read and understand this Certification, that the statements made in this Certification are complete and correct, and that I am authorized to execute this Certification on behalf of Foreign Bank.

PT. Bank Danamon Indonesia, Tbk
[Name of Foreign Bank]

_____
[Signature]

Rita Mirasari
[Printed Name]

Director
[Title]

Executed on this 02 day of January, 2018.

P. Lavi
21 Overbrook Lane, Glen Head, New Yor[
E: plavi3621@gmail.com • T: +1.516.

*letter to attention
of Temaseck
holding owner of
Danamon Bank
befer was sold
to mitsulichi
MUFG*

November 15, 2018

For the Kind and Immediate Attention
Mr. Lee Thing Kiat, CEO Temaseck International
Mrs. Ho Ching
Mr. Simon Israel

With reference to my fax dated 12 November 2018, I should indeed thank you for instructing Mrs. Henny Gunawan, Regional Manager no. 2 of Danamon Bank to meet with me from 10am until 3pm in the afternoon. Unfortunately as she was not aware of the facts and many communications which I had with the your bank since 1997 we could not come to any amicable resolution.

I respectfully request you to note the following;

According to documentation which Bank Danamon has received on or about 1 May 1997 I have requested Bank of Danamon to change one billion of my rupiah account to United States dollars. Today in our meeting I found out that the exchange rate at that time was 2,400 rupiah per US dollar. The exchange was effected and I should had the amount of $466,666.00 in my US account.  In that respect I had talked to Ms. Novi of your bank, I had sent a fax on 11 November 2002 reconfirming that on 2 May 1996 I have deposited with Bank Danamon $500,000. which had been changed to rupiah at 17.5% interest monthly compounded. At the time of deposit I was talking to Ms. Once of your bank who confirmed that although the account will be for three months but in case you keep in your rupiah account until you withdraw the same rate and terms of payment shall apply. Moreover in case you change your account in US dollars the interest rate will change. That was my understanding at that time.

To make sure that I will not have any misunderstanding with your esteemed bank on 13 November 2002 by registered letter as herewith attached and by fax I sent three page letter reconfirming that the interest should be 17.5% monthly compounded and in May 1997 when I asked by fax and by telephone to exchange one million of my rupiah account to US the rate of interest should be 8.5% monthly compounded until it is fully paid. My discussion with Ms. Novi was on 2 May 1997. The exchange rate on the time of my discussion was 2,400 rupiah per US dollar. Therefore my one billion rupiah was US $416,666. based on the finding of Ms. Henny Gunawau, Regional Manager no. 2.

According to Bank Danamon letter dated 2 May 1996 which I am attaching herewith enclosed I was not supposed to pay any commission to the bank in case I keep my deposit in rupiah. In respect of my deposit in US dollars I was supposed to pay 1/8 % of amount. Your bank has charged me twenty percent commission (taxes) whereas in other communications I have confirmed to them that Ms. Once at the time which I deposited when I asked what is the meaning of commission she explained taxes.

Page 1 of 3

**P. Lavi**
**21 Overbrook Lane, Glen Head, New York 11545, USA**
**E: plavi3621@gmail.com • T: +1.516.480.2000**

During 1997 through 2004 I have sent about 100 faxes to your bank reconfirming my position that the interest rate must be 17.5% per annum compounded monthly and the interest of my US dollar account should be 8.5% per year compounded monthly. Your bank has never denied or rejected any of my letters.

I am attaching herewith enclosed a few of the letters for your kind and immediate instruction and your kind advise and strict instruction to your people in Jakarta to settle my account amicably and based only on documentation which has never been denied, challenged or rejected.

In respect of the payment of $458,000. to my sons account, according to the letters which are hereby attached I have requested them that once the transfer is effected they should send me the confirmation of transfer which has never happened. During February 2018 when I was in Jakarta for 33 days, Danamon had no evidence of paying $458,000. I gave to Branch Manager of Kibon Sirih a copy of my request. After almost six months I received a document that the transfer had been made but my son, Edmond Lavi, has never received such amount.

According to the law of the land the bank should show that in fact they had deposited the amount to the beneficiary account which Bank Danamon has not yet been in position to substantiate. Respectfully request you to instruct your people to settle my account according to verifiable documents.

To show the mismanagement of Danamon Bank during the years between 1997 through 2003 I am attaching herewith enclosed Danamon Bank letter dated 17 July 2001 addressed to undersigned as Parviz Lavi claiming that my letter dated 26 June 2001 has no meaning whatsoever for them as they cannot find my name in the bank. Moreover I am attaching herewith enclosed a few documents even dated 1998 whereas Danamon has refused to reply to many of my faxes up to that time. I have about 50 faxes and registered letters to Danamon Bank which were never replied.

Please note that on three different occasions I had requested Danamon Bank in the past to transfer the amounts of $40,000., $60,000, and $130,000. to my personal accounts while I had even sent them power of attorney. Such demands were never complied. I had opened my account with your bank on 2nd May 1996 by depositing $500,000. on 5th May 1995. I invested in Los angles $943,000. purchased 3540 Wilshire Blvd. in Los Angles, California and sold it in August 2010 for $37.5 million. I only had $8.2 million mortgage. The building generated during my ownership over ten million dollars. Undersigned and partners had a profit of not less than $30 million dollars. Having $500,000. deposit in your bank after 22 years I received $166,700. with some not verifiable papers that Danamon Bank had paid to my son in Los Angles $458,000. while Danamon Bank on their letter dated 17 July 2001 claims that I did not have any account with them.

For undersigned your esteemed company is one the most reputable in the world, but whatever Danamon Bank has done to me during last 22 years is shameful and must be corrected. This bank has used United States postal services by false presentations of material facts which based on mail and sure fraud will be subject to substantial amounts of punitive and exemplary

**P. Lavi**
**21 Overbrook Lane, Glen Head, New York 11545, USA**
**E: plavi3621@gmail.com • T: +1.516.480.2000**

damages by United States Treasury Department. Danamon Bank mistakes should be compared to BNP which finally paid $9 billion to United States Treasury Department.

Undersigned due to the fact that I intend to have our manufacturing facility in Indonesia have prevented any legal actions. I appreciate your kind and immediate instructions as I have been waiting for this resolution for the last 22 years and ask your kind help to settle this matter ASAP.  In case there is still any doubt I kindly request you to let me have the pleasure of meeting you immediately on Monday or Tuesday next week in Singapore.

Respectfully submitted,

Pierre Lavi

*Att: Documents as mentioned*

1). Fax dated 16 Jan 2004 asking copy of Transfer
2). Fax dated 1 August 2003 Never Replied
3) Fax dated 11 Nov 2002 Never Replied
4) Fax dated 13 Nov 2002 Never Replied or Repeated
5) Fax dated 19 Dec 2002 Never Replied or Repeated
6) Fax dated 20 Jan 2003 Never Replied OR Repeated
7) Fax dated 21 Jan 2003 Never Replied
8) Fax dated 11 Feb. 2003 Never Replied
9) Fax dated 12 May 2003 Never Replied
10) Fax dd 23 June 2003 Asking Transfer of $500 000
     To Citi Bank NY never did
✓ 11) Fax dated 19 December 2003 Never Replied
12) Fax dated 27 Jan 2003 Never Replied

13) Fax dated 12 Feb. 2004 Never Replied
14) Fax dated 14 Jan 2004 Never Replied Never
15) Danamon Bank letter dd 17 July 2001 Complied
     Confirming that I have No Account with them



CERTIFIED MAIL

7022 3330 0001 0571 5793

PLAVI
10 AUSERIEHL Court
Huntington NY 11743

Honorable Judge J. Paul Oetken
United State District Court
500 Pearl St
New york N.Y. 10007

USM SDNY

U.S. POSTAGE PAID
FCM LETTER
HUNTINGTON, NY
11743
MAY 26, 23
AMOUNT
$8.37
R2304P118897-08

RDC 99

10007